The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Afternoon, gentlemen. Welcome to the Fourth Circuit. We would prefer to see you in person, but this is as good as we can do under the circumstances, so we thank you for joining us by video. We'll be hearing the case of Foodbuy, LLC v. Gregory Packaging, Inc. And we'll hear first from Mr. Wood. Thank you, Your Honor. May it please the Court, I'm Bill Wood with the Nelson Mullins Firm, here on behalf of Foodbuy. We're asking the Court to reverse the decision of the lower court interpreting the contract in this particular case to provide what turned out to be seven-something million dollars worth of damages. We believe that the lower court appeared in its interpretation of the contract, Your Honor, and I'd like to address the contract interpretation first. Mr. Wood, can you hold on for just a minute? Mike Dean, are you listening in? I'm having Mr. Wood's transmission. Visual is fine, but the audio is sort of garbled. Yes, thank you, Your Honor. I was getting ready to say, we believe the district court has misinterpreted the contract in this case. The issue of contract interpretation is one that's subject to the NoVo review by this court. We believe the way the contract has been interpreted nullifies or makes supersized many of the provisions of the contract. And in particular, the main issue here is whether or not we were allowed, under the contract, to charge for a case or get an allowance, which is defined, I believe, in Section 6 and then in Attachment D, an allowance for a case of juice sold to a committed customer from a distributor that Gregory sold into one of our food-buying distributors, and whether we get that regardless of whether the price was any particular number. And we would say, yes, indeed, Your Honor. We believe the main issue here, the lower court interpreted Section 2 to impose a price component all the way through the entire contract, even in those provisions where a price component is not included. So, for instance, the particular place where this is important is in Paragraph 19 of the agreement, and that would be on 1562 of the appendix. The contract begins on 1559, goes through 1562, the main part of the contract, and then there are several attacks. In the Agreement 19, it very specifically says, And unless otherwise agreed to by the parties in writing, this agreement shall apply to all imports, purchase orders, and other documents of purchase which a food-buy or a food-buy distributor purchasing on behalf of a committed customer may place to the seller, on which the seller may generate as a result of a cross-request to the producers for other items purchased from the seller on behalf of the committed customer. And there's a sentence there about conditions applying into those orders. And then it says, This agreement shall apply to any purchase. There's no qualification there. It doesn't say purchase at a particular price or anything along those lines. It says, This agreement shall apply to any purchase and sale transaction between seller, that would be Gregory Packaging, and food-buy, a committed customer, or a food-buy distributor purchasing on behalf of food-buy or a committed customer. And the contract goes back, I believe it's in Paragraph 6, Your Honor, and defined to the committed customer in this. And a committed customer is someone on a list. It's not someone paying a particular price. So, if you look at Paragraph 6, which would be back on, excuse me, it's Paragraph 3, Your Honor, so I apologize for misstating the paragraph. But it's on 1559 of the appendix. It says there, The term committed customer shall mean a client of food-buy that has agreed and invited to authorize food-buy to negotiate a commercial term. It's a terms of purchasing contracts on its behalf or is outsourced all or a portion of its purchasing functions to food-buy by written agreement. A list of committed customers, as of the date hereof, is attached to as Attachment B. And if you go over and look in B, it's strictly the list of customers. It doesn't say how much they're paying, what time. There's no qualifications as to who is a committed customer. They're defined on the list. If you actually go look at the list, I think there's another provision later on that talks about how it applies to a committed customer who's all persons in a group. So, if one is a group, is their account also part of a group of customers? Mr. Wood, let me ask you a question. As I understand the brief from opposing counsel, they argue that the interpretation that food-buy gives now was not the course of conduct that the parties engaged in prior to the litigation. What's your response to that? That's incorrect, Your Honor, and I was going there after I talked about the provision, but I'll go there straight now. If you look, very interesting, right at the beginning of the negotiation for the original contract, there's a series of testimonies about that. That was a negotiated contract. This discussion starts at Appendix 790. The gentleman negotiating for us was Mr. Stiletto, and he sent a draft out, and then Mr. Goulet, who was negotiating on behalf of food-buy, sent a red line with items to negotiate. He had 18 ideas that he wanted to do, and Goulet, his e-mail at 795, indicates he had legal counsel to report it to. Neither of these companies are sophisticated or to use the colloquial expression rude. They know how to negotiate. And Mr. Goulet expressly asked about excluding some people from the customer list. There was a proposed committed customer list and a proposed distributor list, and we said, well, these are on our thing. We want to keep them on there. If you could show us a reason why we will take them on. In fact, we took some people off the list so that they would not be charged for cases sold to those people. Med Assets was one of them. If you look on the committed customer list, which is attached to 1566 of the appendix, one of the groups that was talked about was Navigator. And if you look at Navigator, what's interesting is EPI, we were going to charge. If the distributor who's listed on C sold to a committed customer on B, we were going to get an allowance for that. But we agreed with them on B, attachment B. If you look in the second column, about a third down, one of the negotiations that occurred right up front was that we excluded Tidewater. Tidewater was a group that they had a separate contract with, and they asked up front, we need that, and as part of the negotiation of the pricing, the complete contract, we agreed to exclude that. We didn't have to do that. We could have said, no, firm down, we're going to collect an allowance on that. They could have accepted the contract with that, and then if it turned out bad, they could have terminated without compulsion. They chose to go forward, understanding that, but for the agreement, we wouldn't charge. There's another example in that same negotiation. Right up front, there was a distributor who was very important. Apparently, it had an existing relationship with a distributor called Gordon Foods, I believe was the name of it. I just have Gordon in my notes, and the second name is escaping me at the moment. If you look at, they wanted Gordon out of the contract. We had relationships, again, with Gordon, and a debate went on about whether we were going to get allowances for the Gordon situation, and what was the end result? If you look in attachment D, which governs allowances, there was a specific negotiation right from the beginning, and we made an exception for Gordon, but interestingly, it wasn't an absolute exception. It was essentially a runoff where they could not be billed for case sold through Gordon as a distributor to a committed customer, but instead, up through October 1, which was a few months from the effective date of the contract, they would have a chance to wrap that up, and Gordon came in, and they got charged for every Gordon case. After October 1, as it says in 1572, it was a distributor. If it distributed to a committed customer, which is our interpretation of the contract under paragraph 2, that would do it. Yes, Judge Qualpham? Mr. Wood, I want to kind of go back to the beginning. I think I understand your argument about your view of the contract interpretation, and I think I understand the other GPIs. If, hypothetically, we think the contract is ambiguous, the district court has cited extrinsic evidence, alternatively, that supports his finding about how the contract should be interpreted. If we assume that the contract is ambiguous, do we review his evaluation of the extrinsic evidence de novo or for clear error? You would review factual findings about something under a clear error standard or a substantial evidence standard. There's some evidence thereof. You would not review that itself de novo, but we would say, look at the order. The first 23 paragraphs of the order have an introduction, and then they mention a couple of paragraphs in the contract, but instead of going through the contract and saying, contract means X. How do I make this contract all hang together? He then switches into what you're talking about, which is fact-finding about relationships, and then uses the fact-finding about the relationships to then interpret the contract. You begin with the terms of the words of the contract, and then you would go to relationship. If there's a specific finding where he says relationship with X, you know, Mr. Goulet, for instance, said X, and my guy said Y, and he picked one as a matter, that would be a clear finding, I would agree, but I believe a lot of the findings were influenced at the beginning by an incorrect interpretation of the contract. I believe that needs to be taken into account. What's the purpose under your view of the contract of the non-solicitation provision? I'm glad you asked, Your Honor. There were two questions that twice two of our people didn't know, but if you actually look at the question, one of them is at 2.03 in the appendix, and the other is at 8.27 of the appendix, and the other is at 8.64 carrying over to 8.65. Or two people said, I don't know, but the reason they said that is the question was asked in a funny way where it appeared that he was asking if Gregory made a deal directly with a customer, what's the point of this? And that's not the way this contract operates or employs. But here's the meaning of it. Once they get access to our customers, the non-solicitation agreement is to keep them from saying, hey, look, I'm paying 150 under this contract. Let's cut a side deal, and I'll get out of the food buy program, and I'll sell it to you for $1.45. That's why it's like that. If you had that kind of a direct deal, or if they said, send it to this non-food buy distributor, buy it through them, not through them, go use the distributor over here, and I'll give you the $1.45 and save you all this trouble for the cut of deal of some kind. That's what the non-solicitation is designed for. And I noticed one of the responses said, I defer to legal. So here is legal's interpretation of what the non-solicitation means. It's not meaningful. We did not want them coming into our agreement and being exposed to our customers and then cutting deals on the side and then leaving our agreement and taking customers out of our program. That's what the non-solicitation is about. Counsel, if I could. Thank you, Judge Agee. If I could, counsel. Was it food buy's position that any customer on the committed customer list, if they bought some of Gregory's products, that an allowance was taken, whether it was through the food buy program or not? It would have to be from one of the food buy distributors. So if Gregory sold into a food buy distributor, and that food buy distributor provided the use to a committed customer, our position is we were entitled to an allowance for that case of use. And the out on this, if it proved to be unmarketable or unreasonable, was a 60-day no-cause exit from the thing. It was not like they were locked in in perpetuity. It's a classic loss leader situation, Your Honor. It's a negotiated situation, like I pointed out earlier. If you look at the Gordon Foods dialogue, which basically runs from 7, particularly at 805, 806 of the appendix, 808, 810. Actually, it starts about 801, 802. We discussed, you know, if we agree with you to exclude Gordon, we're going to lose X. We need to make that up somewhere in the contract. And we worked that out. And we came up with the compromise of October 1. But in the absence of notice, they wanted to compromise. There was something. They had some kind of alternate arrangement. We believe by the terms of the contract, Section 19, we were entitled to an allowance on that case of use. And, again, if it became commercially oppressive to them, it's an easy out, 60 days and you're out. And you would lose. Judge Klee, has that answered your question? It has, Judge Agee. Thank you very much. All right. Thank you, Mr. Wood. You've got time left on rebuttal. Mr. Ferguson, we'll hear from you. Thank you, Your Honor. I may please the court. I'm Russ Ferguson, representing appellee and counterappellate Gregory Packaging, Incorporated. You know, there are really two issues here that the court reviews de novo. That's the interpretation of the contract and whether the factual findings in this case rise to the level of an unfair and deceptive trade practice, which is a matter of law. I want to pick up on the contract issue just because that's what we've been discussing, and particularly to answer your question, Judge Agee, is did the court consider the conduct of the parties? And the answer to that question is unequivocally yes. And if you look at page 1,516 of the joint appendix, there's a nice list there where the court went through the conduct of the parties and said, here is the conduct, here are the actions that informed the interpretation of the contracts. Now, the court can look at that. In order for the court to, district court, to have considered the conduct of the parties, it first would have had to have concluded that there were ambiguous parts of the contract that required extrinsic evidence. No, Your Honor. No. No, Your Honor. The district court, I believe, did take that stance, but I don't believe that's correct under the law, at least as North Carolina would see it. And if you look at the North Carolina Court of Appeals decision in Bickett v. McLean Securities, they looked at it, an unambiguous contract, and this court has twice looked at an unambiguous contract and said, we must look at the conduct of the parties during the course of the contract. And this court said that in Maersk Line in 2008, and earlier in that in Management Systems Associates in 1985, this court said the conduct of the parties, as they interpreted it during the contract, is subject to great, if not controlling, influence. So I do believe the court can get there before finding this contract is ambiguous. And, of course, both parties here do find this contract is unambiguous. Now, the couple other points I want to. It's unambiguous, but unambiguous in different ways to the two parties. That's correct, Your Honor. We both read it unambiguously, but come out with a different conclusion. And ours is the conclusion of the district court. Which might lead a court to conclude that there was some ambiguity there. It could, Your Honor. It absolutely could. And if the court finds ambiguity here, that would certainly be harmless error, because the district court went to that next step and said, well, even if it were ambiguous, here's all the factors I looked to, and I interpreted this contract to find that it was interpreted the same exact way as the district court did. And that is that FUBI does not get a volume allowance for cases that it had nothing to do with. And I think the key fact that's perhaps missing there, at least in the briefs, is that Gregory Packaging didn't know that FUBI even would have knowledge of those cases. Gregory Packaging didn't know, and this is in the findings of the fact of the district court, Gregory Packaging didn't know that FUBI had gone to the food distributors, cut a separate deal, and said, give me all your data for every case Gregory Packaging is selling to our committed customers. So in a normal commercial relationship, FUBI would have knowledge about the cases that FUBI sold. Here, FUBI had knowledge of cases that FUBI didn't sell, and charged a volume allowance for those cases. Let me take another couple minutes on the contract, since we were talking about a couple other points. And one is the exclusions in the contract. Well, when you exclude someone from the contract, like say Navigator was excluded or Gordon Foods was excluded, that means a volume allowance is not earned on those cases, even when they're purchased through the FUBI program. That means that the rest of the contract applies, but it doesn't because you've specifically excluded it. Now in the case of Navigator, the court found, and this is at paragraph 27, page 1476 of the Joint Appendix, that FUBI charged Gregory Packaging for Navigator anyway, even though they were excluded. And on the Gordon's exclusion, that my friend on the other side discussed, the district court found that Gregory Packaging was charged for cases of juice through Gordon's that were never purchased at all, just wholesale made-up cases. But what the exclusions don't address are cases that are already outside of the contract. And if you look at paragraph 2, and I know this is in the brief, so I won't belabor the point, but paragraph 2 sets out at the very beginning of the contract to what this contract applies. So paragraph 1 is the term, and you get to paragraph 2, and the language is very clear. It says this agreement contains the terms and conditions for. So what follows is what the terms and conditions of this contract apply for. And there are four prongs. One, a product that's listed in the contract, the product specified in Attachment A. Two, at the prices specified. Three, sold by seller to a FUBI distributor, which is also defined and listed. Purchasing on behalf of a committed customer, which is also defined and listed. Now the key prong here is the second prong, the price prong. Because if you're not buying through the FUBI program, you're not buying at the FUBI price. And that's a factual finding the district court found. And so the rest of this contract doesn't apply to a purchase that doesn't satisfy those four prongs. Now my friend on the other side points to two sections, and I'd like to briefly touch on them both. The first is the non-solicitation section in paragraph 18. And the question is right. Why would you have a non-solicitation provision if Gregory Packaging could go, cut a separate deal, and FUBI would get a volume allowance anyway? Why would they care? It's less work for them. But even more telling is, I think, the language of the non-solicitation provision. Because if you look at it, it says, during the term of this agreement, absent prior written consent from FUBI, seller will refrain from soliciting any FUBI committed customer to procure products from seller. And here's the cure language. Outside of the committed customer's relationship with FUBI. That language contemplates a situation where a committed customer on the list is going outside of FUBI to buy Gregory Packaging's products. Now obviously FUBI doesn't want that happening, and that's why that provision is there. Now if Gregory Packaging doesn't solicit that business, and a customer buys outside of the FUBI program, then obviously a volume allowance is not owed, or that provision would not be there. Now Section 19, Your Honor, is obviously at the end of the agreement where there's kind of the non-operative terms, and it's limited by Section 2. The whole agreement only applies to those transactions that come into Section 2. But even if you look at Section 19, which is the integration clause, what you're really looking at is language that's defining an order. An order is invoices, purchase orders, other documents, purchases with FUBI, blah, blah. And it goes on, and it talks about items purchased from seller on behalf of committed customers. Well, remember that committed customers is defined in Section 3. And if you look at Section 3, the definition of a committed customer is a client of FUBI that has agreed in writing to authorize FUBI to negotiate the commercial terms of purchasing contracts on its behalf. And I don't think anyone can say price is not a commercial term in a contract. So a FUBI distributor is not purchasing on behalf of a capital C committed customer unless they're buying at FUBI's price. Now, the interpretation of the contract is before you, de novo. So is whether the clear factual findings of the district court rise to the level of an unfair and deceptive trade practice under North Carolina law. Now, the facts themselves are very clearly under a clear error standard of review. The facts themselves. But it is a question of law as to whether those facts make up or amount to an unfair and deceptive trade practice. And it's not only a question of law, it's a question of state law. And this is a place where the North Carolina state courts have spoken. The most stark unfair and deceptive trade practice, and I think there are a lot, including misrepresentations, which are fairly clear, but the starkest is the systematic overcharging. There can't be a question that the district court found systematic overcharging here as a factual matter. There may be a question about the interpretation of the contract. But given its interpretation, there was systematic overcharging. Well, the North Carolina Court of Appeals, in a case called Sampson-Bladen Oil in 1987, said that systematic overcharging is an unfair and deceptive trade practice. How did they define overcharging? Charging more than a contract permits. There was a contract there between two parties, and the court said, that's an unfair and deceptive trade practice as a matter of law. Counsel, is it your position that if there was overcharging based on an incorrect but innocent interpretation of the contract, that North Carolina law classifies that as unfair and deceptive trade practices? Yes, Your Honor. Does that case you just said say that? I know it talks about systematic overcharges, but does it say overcharges pursuant to an incorrect but unintentional interpretation of the contract? No, Your Honor. That case does not say that. But there are other cases from the North Carolina Supreme Court that say good faith is not a defense to the unfair and deceptive trade practices act. And that's what FUBA is saying. They're saying, well, we interpreted this contract in good faith, and we can quibble with that, but we interpreted it in good faith and misinterpreted it. But the North Carolina Supreme Court has said over and over again, in Marshall v. Miller, they said it in the 1980s. In 2000, they said it in Gray v. North Carolina, underwriting, that good faith is not a defense. They say the intent is irrelevant. Whether someone acted in good faith or bad faith has no bearing on unfair and deceptive trade practices in North Carolina. And I know that is different than some other states. Counsel, let me follow up a little bit, back to the beginning of this discussion. The district court order spends a lot of time on the economic loss rule. And I understand your position with respect to that. But then it has a fairly brief section, if you will, an alternative section about aggravating circumstances, where there is still arguably dealing with the tortious interference claim. Maybe not as hard for me to tell, quite frankly. And so if you are right on the economic loss rule, why do you say when we have a fairly unclear provision of the order on that, that we should make a ruling as a matter of law to you, as opposed to let the district court consider that without the confusion of kind of commingling with the tortious interference claim? So thank you, Judge Quattlebaum. I think I understand your question. So the district court made a legal conclusion that there were no aggravating circumstances here. And at least I think that's what the district court was trying to do. I think you got it right. They conflated the two concepts. The district court conflated economic loss rule with aggravating circumstances, which are separate. But that is the conclusion of law that you reviewed de novo, and it's a question of state law. And the state has said that, one, systematic overcharging is an aggravating circumstance. Because they found in cases with contracts that that's an unfair and deceptive trade practice. They've done the same thing in cases where misrepresentations. And I think the district court's factual findings made a pretty clear finding of a misrepresentation. They said the employee in charge of the relationship was saying internally that Benjamin Foods, which is a distributor, was not following their pricing and shouldn't be entitled to a volume allowance. And at the same time, turning around and saying to Gregory Packaging, well, they are using your pricing, which is not only a misrepresentation in itself, but it's also concealing food buyers' breach, which is another aggravating circumstance. Because instead of saying, you're right, they're not using your pricing, but you owe us a volume allowance anyway, they're trying to keep the scheme going by saying, well, they are using your pricing, and that's why you owe us a volume allowance, not because we interpret the contract to say we get one anyway. So all of those things, as a matter of law, Your Honor, are an aggravating circumstance. And I think the district court just got that wrong. Well, if there's evidence in the record that would support a conclusion that there is no aggravating circumstances, is it your position that we can't consider that evidence to determine that there was some evidence, substantial evidence, from which the district court could have found the absence of aggravating circumstances? I understand your argument that there was evidence that supported it, but if there's evidence in the record that would lead to the opposite conclusion, why can't we consider that in determining whether we should affirm the district court or not? Well, you absolutely can, Your Honor. You can consider whatever evidence you'd like in making a de novo determination of whether there are aggravating circumstances or not. What I'm saying is there are factual findings in the district court that are a per se unfair and deceptive trade practice under North Carolina law. And in that case, it would be error not to find it. And if you look at the Top Shelf Management case, which is a Middle District of North Carolina case, they say, and I'll quote, intentional misrepresentations are per se violations of Section 75-1.1, which is the North Carolina Unfair and Deceptive Trade Practices Act. And I think it's clear the court found a misrepresentation. There's also factual findings outside of the contract. For example, and I know it was a small part of the damages, but the court found that there were cases simply made up, as the court put it, that were never purchased at all. For which a volume allowance is owed. That's at page 1503 of the joint appendix. Now, I don't think either interpretation of the contract says that a volume allowance is owed for cases of juice that were never made. And so that is actually outside the contract. And I think that's another reason you could find an unfair and deceptive trade practice here as a matter of law. And keep in mind, it only takes one. You don't have to find systematic unfair and deceptive trade practices. You only have to find either an unfair trade practice, which is broader, or a deceptive trade practice. And I think the district court found both here. And keep in mind that the North Carolina courts interpret the Unfair and Deceptive Trade Practices Act liberally. And the Fourth Circuit has noted that in the Gilbane case, and more recently in the South Atlantic Limited case that it's in fact limited. And that even a truthful statement can be an unfair and deceptive trade practice if it has the capacity to mislead. And I think the district court did find that. And at 1496, the judge says that FUBI acted all along as if they were interpreting the contract as Gregory Packaging does. Yet, when it gets – they weren't at all interpreting the package that way. And instead, to the tune of millions, were charging for volume allowances that were not owed to them. And that Gregory Packaging did not even know they knew about. I see my time's running out. Since that seems like a fair stopping point, I'll stop there, Your Honor, unless you have any other questions. Judge Quattlebaum, Judge Klee, do you have any more questions at this point? No, thanks, Judge. All right. Thank you very much. Mr. Ferguson, we'll hear again from you shortly. Mr. Wood? Yes, Your Honor. Addressing the thing, I believe the economic loss rule does apply here. The briefs point out there is no North Carolina Supreme Court case on that. I did look at one court of appeals decision, and I will admit that it itself is ambiguous. In some regards, it says it's reversing or it's upholding the case of the Signature Construction Development 2016. The date is – I forgot to write down the thing. I apologize, Your Honor. Hang on. I might have it. I do not. I apologize. I didn't write the site down. But it is a case out of the North Carolina Court of Appeals. It does say that it is affirming a decision by the trial court in that case. There's also the Coker v. Daimler-Price case, 204 Best Law 32676, another state court. That's a trial court case. It came out of the Superior Court, the business court. It was affirmed on other grounds by the Court of Appeals at 617 Southeast 2nd Street. The Court of Appeals did not reach the ELR, the economic loss rule question. There have been several district courts in South and North Carolina that have ruled that way. Judge Osteen in Bush v. Daimler-Price, 411 F-Sub 2nd 614 2006, applied the economic loss rule to a UTPA claim. Mecklenburg County v. Nortel Government Solution, 208 Westlaw 406319. That's, again, a western district case. Judge Mullen applied it. I believe the economic loss ELR, the economic loss rule, can be applied here. There are several decisions that have done it. I will say, there is the case, Ellis v. Louisiana Pacific Corporation by this court. It's at 699 F-3rd 778, acted cautiously. This was in 2012. And they ruled, despite a lot of similar type findings you had here, that there was not substantial aggravating factors. It's not just, I find a factor that's aggravating. They have to be substantial aggravating factors. And I think this goes to the point that Judge Quattlebaum was making. There is evidence here that they weren't substantial. Opposing counsel even mentioned there were some cases that were charged for, that there's some evidence about maybe cases that were charged for that were never shipped. And he himself said it was a small amount of those things. Those kind of errors were always corrected when they were brought to the attention of GPI. I gave an earlier instance, when this contract was negotiated and renegotiated in 2013, they brought to our attention, we had a new committed customer because of a merger. We believe that we're in time. Yes, Judge Quattlebaum. Mr. Wood, given the way the order is drafted, if we disagree with your view on the economic loss rule, I ask this to your colleague, I want to ask this to you too. Given the limited and maybe even a little confusing discussion of aggravating circumstances, is the best approach for us to decide, either based on the evidence in the record that there are aggravating circumstances or if we felt there was evidence to the contrary as well, is the appropriate thing for us to do that or to remand it for the district court to be able to address that specific question without any influence of the tortious interference claim? I believe, Your Honor, that you all could address it. Look at the evidence. That is the meaning of de novo review. I don't think it has to go back. You could send it back, but I don't believe it has to. And I think you can do it based on your decision in Broussard versus Meinicke-Muffler, 155F331, offered a long discussion in there about what it takes to get you past the substantial aggravating factor standard. The court, speaking through Judge Wilkinson, makes it clear that, look, a UTDPA claim shows up as boilerplate, and every breach of contract case comes into court or gets filed. And you've got to have more than just breaches of the contract, which is all they've alleged, breaches of the contract. You didn't service it the right way. You were charging this, not that. You've got to have more than that. You've got to have something bigger that has to be substantial, not just, as I believe counsel said, if you have one little finding of that, you can tag somebody for triple damage. I believe the Broussard case would allow you to proceed and affirm the court because I believe, at best, you've got mixed evidence here and should affirm the court. He's looked it over. He heard the witness. He knows whether there was evil intent that needs to be punished with a triple damage injury, and he's reached the conclusion that there is not substantial aggravating circumstances. Everything here is skewed about what the contract means. It all turns back to that. What information did you have to look at? Look in our agreement, it says we could rely on what the distributors sent us, which was I sent cases to this customer who's a committed customer of yours. We billed for those. Now they're saying, no, you should only bill for ones that were charged a certain price, but that contradicts our contract, which does not allow us. The contract itself says all that matters is what the distributor, the info sent to the distributor, make the call. Mr. Wood, you're beyond time now. Judge Quattlebaum or Judge Klee, anything else for Mr. Wood? I apologize for running. That's okay, Mr. Ferguson. My clock went out, Your Honor. I can't see the clock, and I apologize. Thank you, Your Honor. On the economic loss rule point, Mr. Wood is correct. The federal courts have simply said that the North Carolina courts have not reached whether the economic loss rule applies to the Unfair and Deceptive Trade Practices Act or not. But that is not the same as saying, and that's true. The North Carolina courts have not said the economic loss rule does not apply to Unfair and Deceptive Trade Practices. But at the same time, they have not applied it, and they have been given the opportunity time and again. So much so that in 1990, the Court of Appeals had to come out with an opinion in the J.M. Westall case, and they had to say, you don't have to have a contract in order to have an Unfair and Deceptive Trade Practices Act. Because as the Middle District noted in the CBP Resources case, the Unfair and Deceptive Trade Practices most often arise in commercial relationships. And because there's a commercial relationship, there's often a contract. So in all these cases where the North Carolina Court of Appeals has seen contracts and seen an Unfair and Deceptive Trade Practices Act claim, they have never applied the economic loss rule to it. In the Garlock case, they said that the breach of contract and the Unfair and Deceptive Trade Practices Act claim can be based on the same conduct and the same damages. That's going about as far as you can from the economic loss rule, which applies to torts. Now, that makes sense to me because if you think about the economic loss rule and the purpose for it, in North Carolina courts, the North Carolina law, the economic loss rule applies when there's a breach of contract and a tort. Because what the courts say is two parties to a contract can allocate that risk. You don't need the tort system, which would just pile on damages because the parties have already allocated the risks between them. But for an unfair act or a deceptive act, you can't really allocate that risk between the parties. By its very nature, you don't know about a deceptive act. So it makes sense that the economic loss rule, which applies to torts, doesn't apply to the Unfair and Deceptive Trade Practices Act. I'm glad my friend brought up the Broussard case. I think it's an interesting case, obviously a seminal case in this area. Yet I don't think it was cited in either of our briefs, and I think that's because the case is so different. But as is often the case when you have a very different case, sometimes that brings out a similarity too. So in the Broussard v. Meineke case, the breach of contract there – and I know it was a complex case – but the thrust of the breach of contract there was that the franchisees paid 10% of their revenues into an advertising fund controlled by the franchisor. And the franchisor used that advertising fund to sue their advertising agency instead of using it for advertising. And the question was, is that a breach of contract? And there was an Unfair and Deceptive Trade Practices Act claim, and this court found there was no aggravating circumstance. And that's true. All you have is a breach of contract. Now, the difference in that case and this is this. If in the Broussard case Meineke had used $1.1 million and sued an advertising firm and not told the franchisees that, then that would be the concealment of a breach. And you would have an Unfair and Deceptive Trade Practices Act. You didn't have that there. Had Meineke said, you know, you owe 10% of your revenues for this advertising fund and sent them invoices for 20% of their revenues every month, you'd have systematic overcharging. You'd have an aggravating circumstance as a matter of law. In Broussard, you didn't have those facts. You had a breach. There was a question about whether it was a breach or not. That question was resolved, and there was no aggravating circumstance at all. Unlike here, where you have a number of aggravating circumstances as a matter of law. And those are not limited to overcharging and misrepresentations. The district court found a number of factual findings that FUBI concealed its breach, that it refused to disclose its breach to Gregory Packaging, which this court said in South Atlantic is an unfair and deceptive trade practice. There are a number of factual findings that FUBI withheld data from Gregory Packaging, and that's more important than it seems. Because Gregory Packaging could not even tell who was overcharging it or how because it didn't have the data to do it. And what happened, and this is in the trial transcript, is it saw its sales remaining somewhat flat and the invoices from FUBI going up. But at first, it didn't know it was FUBI. It didn't know what was happening. And it went to every other GPO. It went to every distributor and said, give us the data and let us see what's going on. And by the process of elimination, FUBI is the only one that wouldn't give it the data. And that's how it figured out it was being overcharged by FUBI here. And still at that point, it didn't understand how or the interpretation of the contract or how FUBI would even know about those cases that were sold. And that is unfair and deceptive. And through all of this, it wasn't just deception. But FUBI knew the effect it had on Gregory Packaging's business. And the district court found a couple times, and it's at 1494 in the order, and there's a couple paragraphs there, where FUBI admitted that on a school bid, given the margins, if they were paying a volume allowance to FUBI on those cases, Gregory Packaging was losing money and admitted it would be detrimental to their business. But they did it anyway. Thank you, Your Honor. Thank you very much. We appreciate counsel joining us by video today. Your experience, if you've been to the Fourth Circuit before, is that you would know that at this point, we'd be coming down to shake hands, which obviously we can't do under the current circumstances. So we'll thank you again for your excellent arguments and hope that we'll all be able to meet enrichment at some future date. And with that, I'll ask the clerk of court to adjourn court for the day. And then if the judges will remain on the video conference. This Honorable Court's plan is adjourned. Counsel to the United States and this Honorable Court.
judges: G. Steven Agee, A. Marvin Quattlebaum Jr., Thomas S. Kleeh